In the Supreme Court of Georgia

Decided: March 21, 2016

S15A1718. GREGORY v. SEXUAL OFFENDER REGISTRATION
REVIEW BOARD.

BLACKWELL, Justice.

The Fourteenth Amendment of the United States Constitution forbids the State to "deprive any person of life, liberty, or property without due process of law," and in this case, we consider what process, if any, is constitutionally due a person whom the State seeks to classify as a "sexually dangerous predator" under the Georgia sexual offender registration laws, OCGA § 42-1-12 et seq.[1] Scott Gregory is a convicted sexual offender, and in 2013, the Sexual Offender Registration Review Board classified him as a sexually dangerous predator. See OCGA § 42-1-14 (a). Gregory timely asked the Board to reevaluate his classification, see OCGA § 42-1-14 (b), but the Board denied his request.

---

[1] We are concerned today only with the process due under the Fourteenth Amendment of the United States Constitution. Although the Georgia Constitution also guarantees that "[n]o person shall be deprived of life, liberty, or property except by due process of law," Ga. Const. of 1983, Art. I, Sec. I, Par. I, no party to this case has advanced any argument on appeal about the process due under the Georgia Constitution. See Barzey v. City of Cuthbert, 295 Ga. 641, 643 (2) (763 SE2d 447) (2014).

Gregory then petitioned the Superior Court of Fulton County for judicial review of his classification, see OCGA § 42-1-14 (c), but the superior court affirmed the decision of the Board. In the course of these administrative and judicial proceedings, Gregory had opportunities to submit favorable documentary evidence to both the Board and the superior court, but he never has been afforded an evidentiary hearing on the question of his classification. Gregory appeals from the judgment of the superior court,[2] asserting that the refusal of an evidentiary hearing is inconsistent with the constitutional guarantee of due process.[3] We agree, and for that reason, we reverse the judgment below and remand for further proceedings consistent with this opinion.

1. In June 2009, Gregory used a computer to broadcast lewd images over the Internet to a person who was, Gregory believed, a teenage girl.[4] As a result,

---

[2] Gregory properly filed an application in this Court for leave to appeal from the judgment of the superior court. See OCGA § 5-6-35 (a) (1). We granted his application, and this appeal followed.

[3] Gregory also contends that, to the extent the Georgia sexual offender registration laws permit classification as a sexually dangerous predator without an evidentiary hearing, the statutes are unconstitutional. That contention, which the superior court considered and rejected, gives this Court jurisdiction of this appeal. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1).

[4] As it turns out, the person to whom Gregory broadcast the images actually was a Forsyth County law enforcement officer.

Gregory was convicted in 2012 of obscene Internet contact with a child, see

OCGA § 16-12-100.2 (e) (1),[5] and for this felony, he was sentenced to

imprisonment, followed by a term of probation.[6] For the purposes of the Georgia

sexual offender registration laws, obscene Internet contact with a child is a

"dangerous sexual offense," see OCGA § 42-1-12 (a) (10) (B) (xvii),[7] and any

[5] At the time Gregory committed the offense of obscene Internet contact with a child, OCGA § 16-12-100.2 (e) (1) provided:

> A person commits the offense of obscene Internet contact with a child if he or she has contact with someone he or she knows to be a child or with someone he or she believes to be a child via a computer on-line service or Internet service, including but not limited to a local bulletin board service, Internet chat room, e-mail, or on-line messaging service, and the contact involves any matter containing explicit verbal descriptions or narrative accounts of sexually explicit nudity, sexual conduct, sexual excitement, or sadomasochistic abuse that is intended to arouse or satisfy the sexual desire of either the child or the person, provided that no conviction shall be had for a violation of this subsection on the unsupported testimony of a child.

[6] Gregory entered a plea of guilty in 2010, but at that time, adjudication of guilt was withheld, and Gregory was sentenced to probation under the terms of the First Offender Act, OCGA § 42-8-60 et seq. Two years later, Gregory was arrested for public indecency, following an incident in which he exposed himself at a public swimming pool. As a result of that incident, his probation under the First Offender Act was revoked, he was adjudicated guilty and convicted of obscene Internet contact with a child, and he was sentenced to imprisonment and probation.

[7] The statutory definition of "dangerous sexual offense" has changed over time. For convictions on or before June 30, 2006, "dangerous sexual offense" is defined in OCGA § 42-1-12 (a) (10) (A). For convictions between July 1, 2006, and June 30, 2015, "dangerous sexual offense" is defined in OCGA § 42-1-12 (a) (10) (B). And for convictions after June 30, 2015, "dangerous sexual offense" is defined in OCGA § 42-1-12 (a) (10) (B.1). Because Gregory was convicted of obscene Internet contact with a child in 2012, the relevant definition for the purposes of this case is set forth in OCGA § 42-1-12 (a) (10) (B), which

3

provides:

"Dangerous sexual offense" with respect to convictions occurring between July 1, 2006, and June 30, 2015, means any criminal offense, or the attempt to commit any criminal offense, under Title 16 as specified in this paragraph or any offense under federal law or the laws of another state or territory of the United States which consists of the same or similar elements of the following offenses:

(i) Aggravated assault with the intent to rape in violation of Code Section 16-5-21;

(ii) Kidnapping in violation of Code Section 16-5-40 which involves a victim who is less than 14 years of age, except by a parent;

(iii) False imprisonment in violation of Code Section 16-5-41 which involves a victim who is less than 14 years of age, except by a parent;

(iv) Rape in violation of Code Section 16-6-1;

(v) Sodomy in violation of Code Section 16-6-2;

(vi) Aggravated sodomy in violation of Code Section 16-6-2;

(vii) Statutory rape in violation of Code Section 16-6-3, if the individual convicted of the offense is 21 years of age or older;

(viii) Child molestation in violation of Code Section 16-6-4;

(ix) Aggravated child molestation in violation of Code Section 16-6-4, unless the person was convicted of a misdemeanor offense;

(x) Enticing a child for indecent purposes in violation of Code Section 16-6-5;

(xi) Sexual assault against persons in custody in violation of Code Section 16-6-5.1;

(xii) Incest in violation of Code Section 16-6-22;

(xiii) A second conviction for sexual battery in violation of Code Section 16-6-22.1;

(xiv) Aggravated sexual battery in violation of Code Section 16-6-22.2;

(xv) Sexual exploitation of children in violation of Code Section 16-12-100;

(xvi) Electronically furnishing obscene material to minors in violation of Code Section 16-12-100.1;

(xvii) Computer pornography and child exploitation in violation of Code Section 16-12-100.2;

(xviii) Obscene telephone contact in violation of Code Section 16-12-100.3; or

(xix) Any conduct which, by its nature, is a sexual offense against a

4

person convicted of a "dangerous sexual offense" is a "sexual offender." See

OCGA § 42-1-12 (a) (20) (A).[8] Gregory is, therefore, a sexual offender subject

to the sexual offender registration laws.

Those laws require every sexual offender convicted of a dangerous sexual

offense on or after July 1, 1996 to fulfill certain registration requirements, see

OCGA § 42-1-12 (e) (2),[9] including a requirement that such an offender register

victim who is a minor or an attempt to commit a sexual offense against a victim who is a minor.
We note that a violation of OCGA § 16-12-100.2 also is a "dangerous sexual offense" with respect to convictions after June 30, 2015. See OCGA § 42-1-12 (a) (10) (B.1) (xvii).

[8] OCGA § 42-1-12 (a) (20) provides:
"Sexual offender" means any individual:
    (A) Who has been convicted of a criminal offense against a victim who is a minor or any dangerous sexual offense;
    (B) Who has been convicted under the laws of another state or territory, under the laws of the United States, under the Uniform Code of Military Justice, or in a tribal court of a criminal offense against a victim who is a minor or a dangerous sexual offense; or
    (C) Who is required to register pursuant to subsection (e) of this Code section.
The term "criminal offense against a victim who is a minor" is defined in OCGA § 42-1-12 (a) (9).

[9] OCGA § 42-1-12 (e) provides:
Registration pursuant to this Code section shall be required by any individual who:
    (1) Is convicted on or after July 1, 1996, of a criminal offense against a victim who is a minor;
    (2) Is convicted on or after July 1, 1996, of a dangerous sexual offense;
    (3) Has previously been convicted of a criminal offense against a victim who is a minor and may be released from prison or placed on parole,

5

annually with the sheriff of his county of residence. See OCGA § 42-1-12 (f)

(4).[10] Sheriffs are required to maintain lists of registered sexual offenders and

---

supervised release, or probation on or after July 1, 1996;

(4) Has previously been convicted of a sexually violent offense or dangerous sexual offense and may be released from prison or placed on parole, supervised release, or probation on or after July 1, 1996;

(5) Is a resident of Georgia who intends to reside in this state and who is convicted under the laws of another state or the United States, under the Uniform Code of Military Justice, or in a tribal court of a sexually violent offense, a criminal offense against a victim who is a minor on or after July 1, 1999, or a dangerous sexual offense on or after July 1, 1996;

(6) Is a nonresident who changes residence from another state or territory of the United States or any other place to Georgia who is required to register as a sexual offender under federal law, military law, tribal law, or the laws of another state or territory or who has been convicted in this state of a criminal offense against a victim who is a minor or any dangerous sexual offense;

(7) Is a nonresident sexual offender who enters this state for the purpose of employment or any other reason for a period exceeding 14 consecutive days or for an aggregate period of time exceeding 30 days during any calendar year regardless of whether such sexual offender is required to register under federal law, military law, tribal law, or the laws of another state or territory; or

(8) Is a nonresident sexual offender who enters this state for the purpose of attending school as a full-time or part-time student regardless of whether such sexual offender is required to register under federal law, military law, tribal law, or the laws of another state or territory.

[10] OCGA § 42-1-12 (f) provides:
Any sexual offender required to register under this Code section shall:

(1) Provide the required registration information to the appropriate official before being released from prison or placed on parole, supervised release, or probation;

(2) Register in person with the sheriff of the county in which the sexual offender resides within 72 hours after the sexual offender's release from prison or placement on parole, supervised release, probation, or entry into this state;

(2.1) In the case of a sexual offender whose place of residence is the status of homelessness, in lieu of the requirements of paragraph (2) of this

6

to make the lists available for public inspection. See OCGA § 42-1-12 (i) (3).

Sheriffs also must submit these lists to the Georgia Bureau of Investigation, see

OCGA § 42-1-12 (i) (2), which furnishes the lists annually to schools, daycare

facilities, and long-term care facilities for children throughout the State. See

OCGA § 42-1-12 (l) (1-3). Many sexual offenders subject to the registration

---

subsection, register in person with the sheriff of the county in which the sexual offender sleeps within 72 hours after the sexual offender's release from prison or placement on parole, supervised release, probation, or entry into this state and provide the location where he or she sleeps;

(3) Maintain the required registration information with the sheriff of each county in which the sexual offender resides or sleeps;

(4) Renew the required registration information with the sheriff of the county in which the sexual offender resides or sleeps by reporting in person to the sheriff within 72 hours prior to such offender's birthday each year to be photographed and fingerprinted;

(5) Update the required registration information with the sheriff of the county in which the sexual offender resides within 72 hours of any change to the required registration information, other than where he or she resides or sleeps if such person is homeless. If the information is the sexual offender's new address, the sexual offender shall give the information regarding the sexual offender's new address to the sheriff of the county in which the sexual offender last registered within 72 hours prior to any change of address and to the sheriff of the county to which the sexual offender is moving within 72 hours prior to establishing such new address. If the sexual offender is homeless and the information is the sexual offender's new sleeping location, within 72 hours of changing sleeping locations, the sexual offender shall give the information regarding the sexual offender's new sleeping location to the sheriff of the county in which the sexual offender last registered, and if the county has changed, to the sheriff of the county to which the sexual offender has moved; and

(6) Continue to comply with the registration requirements of this Code section for the entire life of the sexual offender, excluding ensuing periods of incarceration.

requirements also are prohibited from residing within 1,000 feet of a childcare

facility, church, school, or "area where minors congregate,"[11] see OCGA § 42-1-

15 (b),[12] and from working or volunteering at any childcare facility, church,

school, or business located within 1,000 feet of a childcare facility, church, or

school. See OCGA § 42-1-15 (c) (1).[13] To the extent that a sexual offender is

---

[11] "Area where minors congregate" includes "all public and private parks and recreation facilities, playgrounds, skating rinks, neighborhood centers, gymnasiums, school bus stops, public libraries, and public and community swimming pools." OCGA § 42-1-12 (a) (3).

[12] OCGA § 42-1-15 (b) provides:
On and after July 1, 2008, no individual [required to register] shall reside within 1,000 feet of any child care facility, church, school, or area where minors congregate if the commission of the act for which such individual is required to register occurred on or after July 1, 2008. Such distance shall be determined by measuring from the outer boundary of the property on which the individual resides to the outer boundary of the property of the child care facility, church, school, or areas where minors congregate at their closest points.
See also OCGA §§ 42-1-16 (b) (residency restriction for individuals required to register by virtue of acts committed between July 1, 2006 and June 30, 2008), 42-1-17 (b) (residency restriction for individuals required to register by virtue of acts committed between June 4, 2003 and June 30, 2006).

[13] OCGA § 42-1-15 (c) (1) provides:
On and after July 1, 2008, no individual [required to register] shall be employed by or volunteer at any child care facility, school, or church or by or at any business or entity that is located within 1,000 feet of a child care facility, a school, or a church if the commission of the act for which such individual is required to register occurred on or after July 1, 2008. Such distance shall be determined by measuring from the outer boundary of the property of the location at which such individual is employed or volunteers to the outer boundary of the child care facility, school, or church at their closest

8

subject to these registration requirements and residency and employment restrictions, it is his conviction alone that renders him subject to the requirements and restrictions.

Additional requirements and restrictions may attach, however, upon a finding that a sexual offender presents a significant risk of committing additional dangerous sexual offenses. The sexual offender registration laws require the Board[14] to assess "the likelihood that a sexual offender will engage in another crime against a victim who is a minor or a dangerous sexual offense," OCGA § 42-1-14 (a) (1), and to classify sexual offenders according to that assessment. See OCGA § 42-1-14 (a) (2). There are three classifications. A "Level I risk assessment classification" signifies that "the sexual offender is a

---

points.
See also OCGA § 42-1-16 (c) (1) (employment restriction for individuals required to register by virtue of acts committed between July 1, 2006 and June 30, 2008).

[14] The Board is
composed of three professionals licensed under Title 43 and knowledgeable in the field of the behavior and treatment of sexual offenders; at least one representative from a victim's rights advocacy group or agency; and at least two representatives from law enforcement, each of whom is either employed by a law enforcement agency as a certified peace officer under Title 35 or retired from such employment.

OCGA § 42-1-13 (a). Members of the Board are appointed by the Governor and serve for a term of four years. See id.

low sex offense risk and low recidivism risk for future sexual offenses." OCGA § 42-1-12 (a) (12). A "Level II risk assessment classification" means that "the sexual offender is an intermediate sex offense risk and intermediate recidivism risk for future sexual offenses," and it is the default classification for sexual offenders. OCGA § 42-1-12 (a) (13). A "sexually dangerous predator" classification indicates that the sexual offender is "at risk of perpetrating any future dangerous sexual offense." OCGA § 42-1-12 (a) (21) (B). In assessing and classifying a sexual offender, the Board may rely upon a variety of information provided by prosecuting attorneys, the Georgia Bureau of Investigation, the State Board of Pardons and Paroles, the Department of Corrections, the Department of Community Supervision, and the sexual offender himself. See OCGA § 42-1-14 (a) (2). Such information may include "psychological evaluations, sexual history polygraph information, treatment history, [] personal, social, educational, and work history," criminal history, and court records. Id.[15] Although the sexual offender is entitled to submit any

---

[15] In pertinent part, OCGA § 42-1-14 (a) (2) provides:
A sexual offender shall be placed into Level I risk assessment classification, Level II risk assessment classification, or sexually dangerous predator classification based upon the board's assessment criteria and information obtained and reviewed by the board. The sexual offender may provide the

10

information relevant to his classification, there is no provision for an administrative evidentiary hearing in connection with the Board's initial assessment and classification of a sexual offender. See id. Upon making a classification determination, the Board must notify a sexual offender of his classification in writing. See OCGA § 42-1-14 (a) (3).

Sexual offenders classified as Level II risk assessments or sexually dangerous predators may seek administrative reevaluation, and in connection with that reevaluation, sexual offenders again have an opportunity to provide information relevant to their classification:

> board with information, including, but not limited to, psychological evaluations, sexual history polygraph information, treatment history, and personal, social, educational, and work history, and may agree to submit to a psychosexual evaluation or sexual history polygraph conducted by the board. If the sexual offender has undergone treatment or supervision through the Department of Corrections or the Department of Community Supervision, such treatment records shall also be submitted to the board for evaluation. The prosecuting attorney shall provide the board with any information available to assist the board in rendering an opinion, including, but not limited to, criminal history and records related to previous criminal history. The board shall utilize the Georgia Bureau of Investigation to assist it in obtaining information relative to its evaluation of sexual offenders and the Georgia Bureau of Investigation shall provide the board with information as requested by the board. The board shall be authorized to obtain information from supervision records of the State Board of Pardons and Paroles regarding such sexual offender . . . . The clerk of court shall send a copy of the sexual offender's conviction to the board and notify the board that a sexual offender's evaluation will need to be performed. . . .

11

If the board determines that a sexual offender should be classified as a Level II risk assessment classification or as a sexually dangerous predator, the sexual offender may petition the board to reevaluate his or her classification. To file a petition for reevaluation, the sexual offender shall be required to submit his or her written petition for reevaluation to the board within 30 days from the date of the letter notifying the sexual offender of his or her classification. The sexual offender shall have 60 days from the date of the notification letter to submit information as provided in subsection (a) of this Code section in support of the sexual offender's petition for reevaluation. If the sexual offender fails to submit the petition or supporting documents within the time limits provided, the classification shall be final. The board shall notify the sexual offender by first-class mail of its decision on the petition for reevaluation of risk assessment classification . . . .

OCGA § 42-1-14 (b). Although a sexual offender is afforded an opportunity to submit documentary evidence in support of a petition for administrative reevaluation, there is no provision for an administrative evidentiary hearing in connection with the Board's consideration of such a petition. See id.

Sexual offenders classified as Level II risk assessments or sexually dangerous predators also may seek judicial review of their classifications, and yet again, they are afforded an opportunity to submit documentary evidence in connection with judicial review. Moreover, there is a provision for the reviewing court to hold an evidentiary hearing, but that provision is permissive, not mandatory:

12

A sexual offender who is classified by the board as a Level II risk assessment classification or as a sexually dangerous predator may file a petition for judicial review of his or her classification within 30 days of the date of the notification letter or, if the sexual offender has requested reevaluation pursuant to subsection (b) of this Code section, within 30 days of the date of the letter denying the petition for reevaluation. The petition for judicial review shall name the board as defendant, and the petition shall be filed in the superior court of the county where the offices of the board are located. Within 30 days after service of the appeal on the board, the board shall submit a summary of its findings to the court and mail a copy, by first-class mail, to the sexual offender. The findings of the board shall be considered prima-facie evidence of the classification. The court shall also consider any relevant evidence submitted, and such evidence and documentation shall be mailed to the parties as well as submitted to the court. The court may hold a hearing to determine the issue of classification. The court may uphold the classification of the board, or, if the court finds by a preponderance of the evidence that the sexual offender is not placed in the appropriate classification level, the court shall place the sexual offender in the appropriate risk assessment classification. . . .

OCGA § 42-1-14 (c).

A sexually dangerous predator is subject to requirements and restrictions in addition to those requirements and restrictions that apply to sexual offenders generally. Most notably, OCGA § 42-1-14 (e) requires a sexually dangerous predator to submit for the rest of his life to electronic monitoring and tracking of his person and to pay the costs associated with that monitoring and tracking:

13

Any sexually dangerous predator shall be required to wear an electronic monitoring system that shall have, at a minimum:

(1) The capacity to locate and record the location of a sexually dangerous predator by a link to a global positioning satellite system;

(2) The capacity to timely report or record a sexually dangerous predator's presence near or within a crime scene or in a prohibited area or the sexually dangerous predator's departure from specific geographic locations; and

(3) An alarm that is automatically activated and broadcasts the sexually dangerous predator's location if the global positioning satellite monitor is removed or tampered with by anyone other than a law enforcement official designated to maintain and remove or replace the equipment.

Such electronic monitoring system shall be worn by a sexually dangerous predator for the remainder of his or her natural life. The sexually dangerous predator shall pay the cost of such system to the Department of Community [Supervision] if the sexually dangerous predator is under probation or parole supervision and to the sheriff after the sexually dangerous predator completes his or her term of probation and parole or if the sexually dangerous predator has moved to this state from another state, territory, or country. The electronic monitoring system shall be placed upon the sexually dangerous predator prior to his or her release from confinement. If the sexual offender is not in custody, within 72 hours of the decision classifying the sexual offender as a sexually dangerous predator in accordance with subsection (b) of this Code section, the sexually dangerous predator shall report to the sheriff of the county of his or her residence for purposes of having the electronic monitoring system placed on the sexually dangerous predator.

In addition, sexually dangerous predators must register with their sheriffs more frequently than other sexual offenders, see OCGA § 42-1-14 (f),[16] and many sexually dangerous predators are subject to an additional employment restriction, prohibiting employment or volunteer work at any business located within 1,000 feet of an area where minors congregate. See OCGA § 42-1-15 (c) (2).[17] Finally, although there are procedures by which a sexual offender may seek to be released from the registration requirements and residency and employment restrictions, see OCGA § 42-1-19, the standard for release is, quite understandably, more onerous for Level II risk assessments and sexually dangerous predators. See OCGA § 42-1-19 (c) (2) (A-B).

_____

[16] OCGA § 42-1-14 (f) provides:
In addition to the requirements of registration for all sexual offenders, a sexually dangerous predator shall report to the sheriff of the county where such predator resides six months following his or her birth month and update or verify his or her required registration information.

[17] OCGA § 42-1-15 (c) (2) provides:
On or after July 1, 2008, no individual who is a sexually dangerous predator shall be employed by or volunteer at any business or entity that is located within 1,000 feet of an area where minors congregate if the commission of the act for which such individual is required to register occurred on or after July 1, 2008. Such distance shall be determined by measuring from the outer boundary of the property of the location at which the sexually dangerous predator is employed or volunteers to the outer boundary of the area where minors congregate at their closest points.
See also OCGA § 42-1-16 (c) (2) (employment restriction for sexually dangerous predators required to register by virtue of acts committed between July 1, 2006 and June 30, 2008).

In 2013, the Board classified Gregory as a sexually dangerous predator. That classification was based principally on the written recommendation of a clinical evaluator, who relied in significant part on documentary evidence of the circumstances that led to the conviction for obscene Internet contact with a child, as well as two incidents — one in 1995, another 2012 — that involved Gregory indecently exposing himself to others. After the Board notified Gregory of his classification, he timely petitioned the Board for reevaluation, and in connection with that reevaluation, he submitted to the Board numerous documents that related to his treatment for psychosexual issues from 2011 through 2013. Those documents included extensive psychological, psychiatric, and psychosexual records, reports, evaluations, and prognoses, as well as letters from both expert and lay witnesses. A different clinical evaluator examined this documentation, concluding in her own written report that the original recommendation was appropriate, and the Board denied the petition for reevaluation. At that point, Gregory timely filed a petition for judicial review. The superior court afforded him yet another opportunity to file documentary evidence favorable to his position, and this time, he submitted a polygraph report and additional letters from expert witnesses, friends and acquaintances,

16

and his supervision officer. The superior court did not, however, afford Gregory an evidentiary hearing, notwithstanding that he specifically requested a hearing, and the court subsequently affirmed the classification determination of the Board. With this background in mind, we turn now to the constitutional question presented.

2. Gregory contends that his classification as a sexually dangerous predator — without affording him any opportunity in person at an evidentiary hearing to present favorable evidence and confront unfavorable evidence concerning the likelihood that he will commit additional dangerous sexual offenses — amounts to a deprivation of his liberty without due process of law.[18] To begin, we must consider whether classification as a sexually dangerous predator implicates the sort of "liberty" with which the Fourteenth Amendment

---

[18] We note that Gregory not only requested a hearing in superior court, but he specifically argued in the superior court that the denial of a hearing would amount to a violation of the guarantee of due process. As our Court of Appeals has explained, even if a party "has a due process right to a hearing, that right might be waived by failure to request a hearing. The trial court has no duty to initiate a hearing until requested by one of the parties. The party seeking a hearing must take affirmative steps to request one." Kraft v. Adams, 248 Ga. App. 141, 144 (2) (545 SE2d 69) (2001) (citation and punctuation omitted). See also Mangrum v. State, 285 Ga. 676, 682 (8) (681 SE2d 130) (2009) (same principle applied to due process right to hearing on motion for new trial). To the extent, if any, that due process demands a hearing in this case, Gregory has preserved his entitlement to such a hearing by his request in the superior court.

is concerned. As the United States Supreme Court has explained, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." Mathews v. Eldridge, 424 U. S. 319, 332 (III) (A) (96 SCt 893, 47 LE2d 18) (1976). "To determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." Greenholtz v. Inmates of Neb. Penal & Correctional Complex, 442 U. S. 1, 7 (III) (99 SCt 2100, 60 LE2d 668) (1979) (citation and punctuation omitted; emphasis in original). In this case, Gregory and the Board dispute whether a classification as a sexually dangerous predator implicates a liberty interest. We conclude that it most certainly implicates such an interest.

On the question of a liberty interest, Gregory points first to the opprobrium and significant reputational harm that follow after a classification as a sexually dangerous predator. The stigma of such a classification seems apparent, and it cannot, we think, seriously be disputed. Nevertheless, as the Board correctly notes, "stigmatization of reputation alone does not implicate a liberty interest sufficient to invoke federal due process protection." State v.

18

Jackson, 269 Ga. 308, 310 (1) (496 SE2d 912) (1998). See also Paul v. Davis, 424 U. S. 693, 701-710 (II) (B) (96 SCt 1155, 47 LE2d 405) (1976). If Gregory pointed to nothing but opprobrium and reputational harm, he would fail to show that his classification implicates a liberty interest. But Gregory does not rely on stigma alone.

To the contrary, as Gregory notes, his classification as a sexually dangerous predator affects him in other ways. For instance, sexually dangerous predators must report to the sheriff more frequently than Level I and Level II sexual offenders. See OCGA § 42-1-14 (f). Sexually dangerous predators cannot work at any business within 1,000 feet of an area in which minors congregate, see OCGA § 42-1-15 (c) (2), an employment restriction in addition to those imposed on sexual offenders generally. Most significantly, as a sexually dangerous predator, Gregory must submit to the placement of an electronic monitoring device on his person, he must wear that device for the remainder of his life, he must yield to the State using that device to track his whereabouts at any time it desires to do so, and he must pay the State for the cost of that device. The requirement that Gregory submit to such electronic monitoring and tracking by means of a device attached to his person is — quite clearly, we think — a

serious restraint of his liberty. See Commonwealth v. Cory, 911 NE2d 187, 196-197 (Mass. 2009); Doe v. Mass. Parole Bd., 979 NE2d 226, 232-233 (Mass. App. 2012). See also Vitek v. Jones, 445 U. S. 480, 492 (III) (B) (100 SCt 1254, 63 LE2d 552) (1980) ("Among the historic liberties protected by the Due Process Clause is the right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." (Citation and punctuation omitted)). Although the Board maintains that a classification as a sexually dangerous predator implicates no cognizable liberty interest, it has failed to point to any persuasive authority for the proposition that compelled submission to electronic monitoring and tracking for life does not affect the sort of "liberty" with which the Fourteenth Amendment is concerned.

Considering the electronic monitoring and tracking requirement, the additional registration requirement, the additional employment restriction, and the opprobrium and reputational harm associated with classification as a sexually dangerous predator, we hold that such a classification implicates a liberty interest. The constitutional guarantee of due process applies to a classification as a sexually dangerous predator under the Georgia sexual offender registration laws. We now turn, therefore, to the question of what

process is due, and more specifically, whether the classification requires an evidentiary hearing.

3. To decide what process is due, we apply the familiar three-factor test that the United States Supreme Court identified in Mathews, 424 U. S. at 335 (III) (A), weighing "(1) the private interest affected; (2) the possibility of erroneous deprivation using the established procedure and the probable value of additional procedural safeguards; and (3) the government's interest in the procedure or the burden of providing greater procedural protections." Subsequent Injury Trust Fund v. James, 261 Ga. 548, 548 (406 SE2d 77) (1991). When applying the Mathews test, the Supreme Court has cautioned that "the very nature of the due process inquiry indicates that the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case." Walters v. Nat. Assn. of Radiation Survivors, 473 U. S. 305, 321 (III) (105 SCt 3180, 87 LE2d 220) (1985). And as Mathews itself notes, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." 424 U. S. at 345 (III) (D). See also Santosky v. Kramer, 455 U. S. 745, 757 (II) (102 SCt 1388, 71 LE2d 599) (1982) (rejecting case-by-case

21

determination of most procedural due process rules, distinguishing the right to court-appointed counsel in parental rights termination proceedings). Nevertheless, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews, 424 U. S. at 334 (III) (A) (citations and punctuation omitted). See also Miller v. Deal, 295 Ga. 504, 510 (2) (2014). "[N]ot all situations calling for procedural safeguards call for the same kind of procedure." Morrissey v. Brewer, 408 U. S. 471, 481 (II) (92 SCt 2593, 33 LE2d 484) (1972). See also Roberts v. Scroggy, 278 Ga. 25, 26 (597 SE2d 835) (2004).

Keeping these principles in mind, we proceed to apply the Mathews test to the case now before us. Because we already have discussed the nature of the liberty interest, weighing that interest as we consider the first factor is a relatively straightforward task. We conclude that the liberty interests affected by classification as a sexually dangerous predator are substantial. In the first place, the stigma that follows such a classification — as well as the broad employment restriction imposed uniquely on sexually dangerous predators, see

OCGA § 42-1-15 (c) (2) — undoubtedly may have a serious "adverse impact on an individual's ability to live in a community and obtain or maintain employment."[19] <u>People v. David W.</u>, 733 NE2d 206, 211 (II) (N.Y. 2000). See also <u>Noble v. Bd. of Parole & Post-Prison Supervision</u>, 964 P2d 990, 996 (Or. 1998). Moreover, the requirement of electronic monitoring and tracking for life implicates weighty liberty interests. Cf. <u>United States v. Jones</u>, ___ U. S. ___ (132 SCt 945, 181 LE2d 911) (2012). That the electronic monitoring and tracking is accomplished by way of a device physically affixed to the person of a sexually dangerous predator also adds, we think, to the weight of the liberty interest at stake. Cf. <u>Missouri v. McNeely</u>, ___ U. S. ___, ___ (II) (A) (133 SCt 1552, 185 LE2d 696) (2013) (in Fourth Amendment context, "invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy") (punctuation omitted).

---

[19] That stigma alone is not enough to show a liberty interest does not mean that it cannot be attributed weight in the weighing of the private interests. See <u>Paul</u>, 424 U. S. at 709 (II) (B) ("The stigma resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived Constantineau of any liberty protected by the procedural guarantees of the Fourteenth Amendment." (Discussing <u>Wisconsin v. Constantineau</u>, 400 U. S. 433 (91 SCt 507, 27 LE2d 515) (1971); punctuation omitted)).

As for the second Mathews factor, the danger of an erroneous risk classification is, we think, "substantially more significant" in the absence of a hearing either before the Board or the superior court. State v. Germane, 971 A2d 555, 580 (I) (A) (2) (R.I. 2009). See also Noble, 964 P2d at 996. This is not the sort of case, like Wolff v. McDonnell, 418 U. S. 539 (94 SCt 2963, 41 LE2d 935) (1974), and Greenholtz, in which "providing additional process creates security risks or provides a negligible decrease to the risk of error, [and] the [Supreme] Court is less willing to afford additional process." Meza v. Livingston, 607 F3d 392, 408 (III) (A) (5th Cir. 2010). See also Wolff, 418 U. S. at 560 (IV) ("one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison"); Shoats v. Horn, 213 F3d 140 (3rd Cir. 2000) (the sole case on which the trial court relied, involving administrative confinement of a prisoner). Instead, this case is more like those that require an evidentiary hearing with confrontation and cross-examination of witnesses (unless there is a finding of good cause not to permit such confrontation and cross-examination), such as Vitek, 445 U. S. at 494-495 (IV), where deprivation of the liberty interest led to

24

stigmatizing and physically invasive consequences to a prisoner, and <u>Morrissey</u>

<u>v. Brewer</u>, 408 U. S. 471, 487-489 (III) (b) (92 SCt 2593, 33 LE2d 484) (1972)

(parole revocation), where the deprivation of liberty caused certain, immediate

adverse consequences to a parolee. <u>Meza</u>, 607 F3d at 408 (III) (A). See also

<u>Roberts</u>, 278 Ga. at 25-26 (reviewing <u>Morrissey</u>). As one not confined by prison

walls, yet subject to the opprobrium of a classification as a sexually dangerous

predator, a broad restriction of the places in which he might become employed,

and a lifetime of electronic monitoring and tracking accomplished by the

affixing of a device to his body (for which he has to pay), Gregory ought to be

entitled to more process than prison inmates who do not suffer deprivations of

liberty beyond their imprisonment itself that are at once stigmatizing and

physically invasive. See <u>Meza</u>, 607 F3d at (III) (B).

This case also is not the sort of case in which an evidentiary hearing is

simply unnecessary because the relevant evidence is largely objective in nature,

presenting few, if any, genuine disputes of fact or credibility. See <u>Noble</u>, 964

P2d at 996; <u>Jamgochian v. N.J. State Parole Bd.</u>, 952 A2d 1060, 1075-1076 (IV)

(C) (N.J. 2008). For instance, the potential value of an evidentiary hearing is

minimal when social security disability benefits are discontinued, as such a

25

decision will turn, in most cases, on routine, standard, and unbiased written medical reports that ordinarily do not involve questionable credibility and veracity even if there is professional disagreement with the conclusions. See Mathews, 424 U. S. at 344 (III) (D). Such medical experts are likely to be able to communicate more effectively through written documents than lay witnesses, and medical conclusions often are supported by objective data uncovered by clinical and laboratory tests and information typically more amenable to written than to oral presentation. See id. at 345 (III) (D). On the other hand, the medical nature of an inquiry does not justify the denial of an evidentiary hearing when the inquiry depends on the meaning of facts that must be interpreted by expert psychiatrists and psychologists. "It is precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings." Vitek, 445 U. S. at 495 (IV) (A). See also Martin v. Barrett, 279 Ga. 593, 595 (619 SE2d 656) (2005) ("We understand that psychiatry is an imprecise and imperfect science at best." (Citation omitted)). This seems especially true when psychiatric or psychological evidence purports to predict the likelihood that someone will commit additional crimes in the future.

In this case, for instance, the record contains extensive psychological, psychiatric, and psychosexual records, reports, evaluations, and prognoses. The record also includes documentary evidence that memorializes divergent accounts of Gregory's prior offenses (particularly the 2012 incident involving indecent exposure), as well as letters from lay witnesses. Considering the record in this case, it is apparent that much of the evidence relevant to a classification as a sexually dangerous predator tends to be subjective in nature, and that evidence often may present meaningful factual and credibility disputes. Without an evidentiary hearing to assess that evidence and resolve these disputes, the danger of an erroneous risk classification is substantial.

About the third Mathews factor, the Board asserts that a hearing in every case involving a classification as a sexually dangerous predator would be very costly, both in terms of time and resources. Other courts have decided, however, that the fiscal and administrative burdens of a hearing on the likelihood of a sexual offender committing additional crimes are not significant enough to justify the refusal of such a hearing. See Germane, 971 A2d at 582 (I) (A) (3); Noble, 964 P2d at 996-997. In addition, we note that OCGA § 42-1-14 (c) already provides that a superior court *may* hold a hearing on the question of

classification in any case in which the court sees fit to do so, without limitation, suggesting that the General Assembly did not consider the cost and burden of such hearings to be a concern that outweighs all others. Finally, we note that the Board has failed to come forward with record evidence to show that a hearing in every case of a classification as a sexually dangerous predator would, in fact, be prohibitively costly.

Considering the three Mathews factors, we conclude that due process demands that an evidentiary hearing be afforded upon request to sexual offenders classified as sexually dangerous predators. We add, however, that we see no reason why an evidentiary hearing would be required in both administrative *and* judicial proceedings. See Germane, 971 A2d at 579 (I) (A) (2) (a); Noble, 964 P2d at 997. As noted, OCGA § 42-1-14 (c) already provides that "[t]he court may hold a hearing to determine the issue of classification." "Unlike a substantive due process claim, a constitutional violation of procedural due process is not complete unless and until the State fails to provide due process." Atlanta City School Dist. v. Dowling, 266 Ga. 217, 218 (466 SE2d 588) (1996) (punctuation omitted) (citing Zinermon v. Burch, 494 U. S. 113, 126 (110 SCt 975, 108 LE2d 100) (1990)). When the State does provide a

hearing at some point in the course of administrative or judicial proceedings, the failure to hold a hearing at an earlier point in the proceedings generally becomes moot or is considered cured. See Atlanta City School Dist., 266 Ga. at 218; Clark v. State, 245 Ga. 629, 641 (5) (266 SE2d 466) (1980); Germane, 971 A2d at 580 (I) (A) (1) (a). Affording an evidentiary hearing to Gregory in which he might present evidence favorable to his cause and confront the evidence against him would satisfy the requirement of due process, regardless of whether the hearing is held before the Board or the superior court.

In this case, the evidentiary hearing requested by Gregory and required by due process has never been held. Accordingly, the judgment of the superior court must be reversed, and the case must be remanded for an evidentiary hearing at which Gregory will have a meaningful opportunity to present favorable evidence and to confront the evidence against him, unless there is a finding of good cause not to permit such confrontation. See Vitek, 445 U. S. at 494-495 (IV); Morrissey, 408 U. S. at 489 (III) (b); Meza, 607 F3d at 411 (III) (B); Roberts, 278 Ga. at 26. It will be sufficient in this case for the trial court itself to hold that hearing pursuant to the statutory authorization in OCGA § 42-1-14 (c). For other cases, the Board may elect to establish procedures by which

29

persons classified as sexually dangerous predators are afforded a meaningful opportunity in an administrative hearing to present favorable evidence and confront the evidence against them, if the Board determines that an administrative hearing would be more efficient and cost-effective than a judicial hearing.[20]

Judgment reversed and case remanded with direction. All the Justices concur.

---

[20] We express no opinion about whether the Board, if it elects to establish procedures for an administrative hearing, would be required to afford a right of compulsory process to the sexual offender, whether the offender would have a right to counsel, and what rules of evidence would apply in such an administrative proceeding.