303 Ga. 890
FINAL COPY

S18A0281.  GEORGIA DEPARTMENT OF HUMAN SERVICES v. STEINER.

GRANT, Justice.

The Georgia Department of Human Services, Division of Family and Children Services ("DFCS") appeals from the decision of the Lamar County Superior Court finding that Georgia's central child abuse registry is unconstitutional, both on its face and as applied to appellee Christopher Steiner.  The trial court also found that DFCS failed to prove that Steiner committed an act of child abuse by a preponderance of the evidence as required to maintain Steiner's listing in the registry.  This Court granted DFCS's application for discretionary review.  We hold that Steiner failed to demonstrate a constitutionally protected liberty or property interest sufficient to trigger the due process protections that he claims were violated by operation of the registry, and because the Act was constitutionally applied to Steiner, he lacks standing to bring his facial challenge on that ground.  We further hold that the child abuse registry is not criminal in nature, and that the

superior court therefore erred in finding it to be so. And because an abuse investigator's determination about whether a report of child abuse is supported by the evidence is not a judicial function, the superior court erred in finding that the statute requiring the investigator to report such cases to DFCS for inclusion in the child abuse registry violates the separation of powers provision of the Georgia Constitution. Finally, because at least "some evidence" supported the administrative hearing officer's conclusion that DFCS had proved an act of child abuse as defined for purposes of the child abuse registry, the superior court erred in reversing the administrative law court. We reverse.

## I.

Georgia's central child abuse registry, also known as the Child Protective Services Information System ("the Act"), is a statutory system that provides for the establishment and maintenance of a central registry containing information about "substantiated" cases of child abuse. See OCGA §§ 49-5-180 – 49-5-187. The Act requires that DFCS investigate reports of child abuse and, if the abuse investigator finds by a preponderance of the evidence that an act of child abuse occurred, information must be added to the registry about the abuse, the abuser, the child victim, and the

child's guardian. See OCGA §§ 49-5-182, 49-5-183. Access to the registry is limited to certain government child abuse investigators and government or licensed childcare-related entities. The registry may only be used for the following purposes: conducting child abuse investigations; screening applicants for childcare-related employment, licensing, or volunteer activities; conducting background checks on current or prospective foster parents and adoptive parents; compiling statistical information regarding substantiated cases of abuse; responding to inquiries from individuals seeking to find out whether the individual's own name is included in the registry; and meeting federal funding requirements. See OCGA § 49-5-185.

OCGA § 49-5-183 requires that DFCS must notify an alleged abuser when his or her name is added to the registry. See OCGA § 49-5-183 (a). The alleged abuser may then request an evidentiary hearing before an administrative law judge ("ALJ") by submitting a written request for a hearing to DFCS within ten days after receiving the notice. See OCGA § 49-5-183 (a) and (c). The general public is excluded from the administrative hearing, and the associated records are kept under seal. See OCGA § 49-5-183 (e). The ALJ makes the final "administrative determination regarding whether, based on a preponderance of evidence, there was child abuse

committed by the alleged child abuser to justify the investigator's determination of a substantiated case." OCGA § 49-5-183 (d). If not, the ALJ must order the alleged abuser's name removed from the registry. OCGA § 49-5-183 (e). Either party may seek judicial review of the ALJ's decision by filing a petition in the superior court of the county in which the administrative hearing was held. OCGA § 49-5-183 (f). The records and judicial review proceedings in the superior court also are closed to the public. Id.

In late October 2016, K. S., a 13-year-old girl, was reported missing by her grandmother, who is her legal guardian. K. S.'s grandmother told members of the local Sheriff's Office that K. S. was likely at Steiner's home, and the investigation evolved into an interference-with-custody case. K. S. was later found to have been at Steiner's home as her grandmother had suspected.[1]

During the course of the investigation, a forensic interview was conducted with K. S. Immediately after the interview, a deputy sheriff spoke with K. S. and obtained a written statement from her that included the

---

[1] Steiner reportedly is or was a friend of K. S.'s mother.

following description of an encounter with Steiner several days earlier at K. S.'s grandmother's home:

> I usually show my affection hugging him. I leaned against him on his stomach and he wrapped his arms around me. He started to hump me a way a dog would. I said stop the first time. Then he done it again. When he done it the 2nd time my nana turned around and saw it. I got off of him and walked away a little from him to make him stop.

According to K. S.'s statement, Steiner was 52 years old at the time. DFCS conducted an investigation and determined that this encounter was a "substantiated case" of child sexual abuse, as defined in OCGA § 49-5-180 (8) and (10) and OCGA § 19-7-5 (b) (10).[2] Steiner's name and identifying information were therefore added to the child abuse registry, along with a copy of the DFCS investigator's report and a classification of the abuse as sexual.

---

[2] OCGA § 49-5-180 (10) defines a "[s]ubstantiated case" as "an investigation of a child abuse report by an abuse investigator which has been confirmed based upon a preponderance of the evidence that child abuse has occurred." OCGA § 49-5-180 (8) refers to the definition of child sexual abuse in OCGA § 19-7-5 (b) (10), which in turn defines "sexual abuse" of a minor as, in relevant part:

> . . .
> [A] person's employing, using, persuading, inducing, enticing, or coercing any minor who is not such person's spouse to engage in any act which involves:
>> . . .
>> (G) Physical contact in an act of apparent sexual stimulation or gratification with any person's clothed or unclothed genitals, pubic area, or buttocks or with a female's clothed or unclothed breasts[.]

In January 2017, after Steiner was added to the registry, DFCS mailed him a letter notifying him of the determination that he had committed a substantiated case of child abuse, of his listing in the child abuse registry, and of the procedure for contesting that listing. The letter identified the "maltreatment" as fondling and the "maltreatment type" as sexual abuse. It informed Steiner that the date of the alleged abuse was October 29, 2016, and that the abuse occurred in Lamar County. On the last page of the notice, the allegations of child abuse were summarized as follows:

> You were substantiated on as a result of K.S. maltreator exposed the child to inappropriate sexual contact which resulted in the maltreator inappropriately touched and dry humped her in the residence of the legal guardian.

Steiner requested a hearing before an ALJ, contesting his listing in the registry and contending that the Act was unconstitutional on its face and as applied to him. Specifically, Steiner argued that it was impossible to tell from the vague and ungrammatical notice what he was accused of doing, who K. S. was, what was meant by "dry humped," and whether K. S. had been "exposed" to sexual contact by witnessing sexual contact between others or by being sexually touched by Steiner or someone else. He also argued that the conduct described in the notice was not an act of child abuse.

Steiner contended that the Act violated the Fifth and Fourteenth Amendments to the United States Constitution and parallel provisions of the Georgia Constitution because it did not provide for adequate notice and a pre-deprivation hearing. He further argued that the Act violated the separation of powers doctrine in that it vested a DFCS investigator with the judicial power to determine whether the allegations of child abuse were substantiated by a preponderance of the evidence. Finally, he contended that because the Act was criminal in nature, he should be granted "the full panoply of rights of a criminal defendant" under the state and federal Constitutions, including the Sixth Amendment right to a speedy and public trial.

Following a hearing at which K. S. and two other witnesses testified, the ALJ issued a written decision rejecting Steiner's petition for removal from the registry and noting that Steiner's motion to declare the Act unconstitutional had been denied at the hearing.[3] The ALJ stated that he had questioned K. S. before she testified and determined that she was capable of giving reliable testimony. The ALJ found that K. S. had recognized the

---

[3] The ALJ acknowledged that he lacked the authority to decide Steiner's constitutional challenges to the Act, but denied Steiner's motion to declare the Act unconstitutional in an effort to preserve the issue for appeal. We offer no view on whether any such denial is necessary or appropriate.

written statement that she gave to the sheriff's deputy and testified that she was telling the truth when she wrote the statement. She also testified that Steiner "tried to hump her like a dog" and that her Nana saw it the second time, which is what she wrote in the statement.[4] The ALJ concluded that the evidence showed that Steiner had "dry humped" K. S., a 14-year-old[5] minor child, twice; that K. S. told him to stop after he did it the first time; and that "[t]here [was] no evidence this was consensual." Applying the preponderance of the evidence standard, the ALJ determined that DFCS had substantiated a case of child sexual abuse, as defined in OCGA § 19-7-5 (b) (10) (G), against Steiner. The ALJ therefore affirmed DFCS's decision to include the incident in the registry.

Steiner appealed the administrative decision to the Superior Court of Lamar County, Georgia. He contested the legal basis for his inclusion in the registry, incorporating the constitutional claims from his petition in the Office of State Administrative Hearings and arguing that the ALJ's decision

---

[4] No transcript of the ALJ hearing was prepared, and the portion of the audio recording that included K. S.'s testimony was omitted from the record in the superior court. Nonetheless, because both parties' representations about K. S.'s testimony are consistent with the ALJ's factual findings in this regard, we accept the ALJ's findings as to the content of K. S.'s testimony for purposes of this appeal.

[5] It appears that K. S. had turned 14 by the time of the administrative hearing.

was clearly erroneous and arbitrary and capricious because the term "dry humping" was never defined or shown to meet the definition of child abuse. Steiner did not appear to contend that he did not actually know who K. S. was, or that he did not have any contact with her.

After hearing oral argument from the parties, the superior court found that (1) the Act violated Steiner's due process rights under the Fourteenth Amendment of the United States Constitution[6] by providing insufficient notice of the act of which Steiner was accused, because the allegation in the notice was too vague and unclear to permit Steiner to prepare a defense; (2) the Act is punitive in application and, because it fails to provide the full range of protections required in a criminal proceeding, it is unconstitutional under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution; (3) the Act violates the separation of powers principle under the Georgia Constitution, Ga. Const. of 1983, Art. I, Sec. II, Par. III, in that "executive branch officials have been vested with the right to perform a judicial function"; and (4) DFCS failed to prove an act of child abuse by a

---

[6] Steiner also claimed that the Act violated parallel provisions of the Georgia Constitution, but the record contains no argument or citation of authority specific to those claims below, and the superior court did not address any parallel state constitutional claims in its order (which apparently was prepared by Steiner's counsel). To the extent Steiner raises any of these parallel claims in this Court, we decline to address them in the first instance on appeal. See *Nathans v. Diamond*, 282 Ga. 804, 807-808 (654 SE2d 121) (2007).

preponderance of the evidence.  Consistent with its conclusions, the superior court reversed the ALJ's findings and ordered Steiner's name to be stricken from the child abuse registry.  DFCS filed a timely application for discretionary review, which we granted.

## II.

We presume that statutes are constitutional, and "before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality."  *JIG Real Estate, LLC v. Countrywide Home Loans, Inc.*, 289 Ga. 488, 490 (712 SE2d 820) (2011) (citation and punctuation omitted).  Because all presumptions are in favor of the constitutionality of a statute, the burden is on the party claiming that the law is unconstitutional to prove it.  Id.

With these principles in mind, we turn to the superior court's conclusion that Steiner's Fourteenth Amendment right to procedural due process was violated because the notice he received of his inclusion in the registry was inadequate to inform him of what he was accused of doing.  The Fourteenth Amendment prohibits government deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  In

evaluating a procedural due process challenge in a non-criminal proceeding,[7] we engage in a two-step analysis: first, we must determine whether a constitutionally protectable liberty or property interest exists; if so, we determine the nature and extent of the procedural protections required. See *Gregory v. Sexual Offender Registration Review Bd.*, 298 Ga. 675, 685-687 (784 SE2d 392) (2016). In determining what process is due, we employ the three-factor balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (96 SCt 893, 47 LE2d 18) (1976) to weigh the competing interests involved. See, e.g., *Gregory*, 298 Ga. at 686-687. Those factors include the private interest affected by the state action; the risk of an erroneous deprivation of the interest under the existing scheme along with the probable value, if any, of additional or substitute procedural safeguards; and finally, the interest of the government. *Mathews*, 424 U.S. at 335.

The superior court applied the *Mathews* balancing test, finding that "[f]undamental rights are at stake" for *anyone* included in the registry and that Steiner's "liberty interests are significant and compelling." Accordingly, the court concluded that due process required the State to provide notice to Steiner before—not after—adding his name to the registry. The court further

---

[7] In Division IV below, we conclude separately that the Act is civil, not criminal.

found that because the notice that Steiner received was essentially incomprehensible[8] and was not sent until after Steiner was added to the registry, his due process rights were violated and the Act was unconstitutional as applied to him.

But "the range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (92 SCt 2701, 33 LE2d 548) (1972). And "[t]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." *Gregory*, 298 Ga. at 685 (quoting *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7 (99 SCt 2100, 60 LE2d 668) (1979)) (emphasis in original). As Steiner concedes, injury to reputation alone does not implicate "any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment." *Paul v. Davis*, 424 U.S. 693, 709 (96 SCt 1155, 47 LE2d 405) (1976). We followed this directive from the U.S. Supreme Court in *State v. Jackson*, 269 Ga. 308 (496 SE2d 912) (1998), a challenge to the previous child abuse registry where we confirmed that "stigmatization of reputation alone does not

---

[8] We have our own concerns about the notice provided (see, for example, Justice Peterson's concurrence in this case), but do not address them in this opinion because of our conclusion on the liberty interest question that precedes notice issues.

implicate a liberty interest sufficient to invoke federal due process protection." 269 Ga. at 310.

So Steiner must show that—in addition to the obvious stigma associated with being labeled a child abuser—his inclusion in the registry also "distinctly altered or extinguished" a "right or status previously recognized by state law." *Paul*, 424 U.S. at 710-712. This requirement for establishing a liberty interest sufficient to invoke the due process protections of the Fourteenth Amendment is known as the "stigma-plus" test. See, e.g., *Behrens v. Regier*, 422 F3d 1255, 1259 (11th Cir. 2005) ("Under [the stigma-plus] test, 'a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation "plus" the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause.'") (citation omitted).

Accordingly, if DFCS "has only defamed [Steiner]—without depriving him of any right or status recognized under state law—then his injury does not rise to the level of a constitutional deprivation and his procedural due process claim must fail." *Behrens*, 422 F3d at 1261. But Steiner's only allegation related to the deprivation of a liberty interest was that the registry

listing impairs his ability to work as a childcare provider or teacher.[9]  This

bare assertion is not enough.

It may be true that entities with access to the registry would decline to

license or employ Steiner as a childcare provider or teacher; indeed, use as a

screening tool before granting a childcare-related license or employment is a

key function of the registry.  But Steiner made no claim that he has ever

worked or applied to work in the childcare field before, or even that he has

any intention of doing so in the future.  Without an allegation that he has ever

attempted to do the activities that he claims are now barred to him—or even

that he had any intention of doing them before he was included in the

---

[9] For the first time on appeal, Steiner also argues that the registry listing forecloses his opportunities for employment with the entire range of state and local agencies with access to the registry, as well as the possibility of becoming a legal guardian, fostering or adopting a child, or volunteering in child advocacy, and that the listing may subject him to future civil liability.  Steiner also now contends that his placement in the registry "implicates [his] family autonomy and privacy," and that he has "a privacy interest in not being labeled as a child abuser for his lifetime."  Perhaps Steiner is attempting to fit within a category of interests described in the *Jackson* opinion.  See *Jackson*, 269 Ga. at 312.  But Steiner does not elaborate on how his registry listing could affect his "family autonomy," given the lack of any familial relationship between Steiner and K. S.  Nor does he explain how a "privacy interest" in avoiding the stigma associated with a registry listing is distinct from the reputational harm that he acknowledges to be insufficient under *Paul*.  In any event, because none of these interests were alleged below, nor were these constitutional arguments made or distinctly ruled on in the court below, we will not consider them on appeal.  See *Nathans*, 282 Ga. at 807-808 ("It is well established that this Court does not ever pass upon the constitutionality of an Act of the General Assembly unless it clearly appears in the record that the point was directly and properly made in the court below and distinctly passed on by the trial judge.") (citation and punctuation omitted).

registry—Steiner has not demonstrated that his listing has set any non-reputational obstacle in his path. We do not agree that the theoretical possibility that Steiner will, in the future, develop an interest in working in child care rises to the level of a "right or status" granted by the state.[10]

Our decision on this issue is consistent with opinions from other jurisdictions holding that the impact of a child abuse registry listing on future job prospects is insufficient to provide a constitutionally-protected liberty or property interest.[11] See *Smith v. Siegelman*, 322 F3d 1290, 1296-1298 (11th Cir. 2003) (although inclusion in Alabama's child abuse registry could adversely affect future employment rights, registrant could not show a protected liberty interest where he had not been "discharged, demoted, or rejected from a job" or even "passed over for promotion"); *Duran v. Buckner*, 157 S3d 956, 970-971 (Ala. Civ. App. 2014) (citing *Smith* and holding that general allegations of harm to future job prospects were insufficient); *Watso*

---

[10]      Even in light of this conclusion, we emphasize that we would have very serious concerns regarding the constitutionality of the statute if the State were to assert that a person included in the registry could not raise a constitutional challenge to the Act after expiration of the ten-day period set out under OCGA § 49-5-183 (a) and (c) if a cognizable constitutional interest subsequently developed.

[11]      These other jurisdictions have reached differing conclusions about precisely what kind of factual showing is required for an effect on employment to meet the "plus" element of the stigma-plus test. Because Steiner has not made any factual showing at all on this issue, we need not reach that question here, and decline to do so.

*v. Colorado Dept. of Social Svcs.*, 841 P2d 299, 304-305 (Colo. 1992) (possibility that appellants might be screened by future employers should they seek childcare-related employment insufficient to form protected property interest); *New Jersey Div. of Youth and Family Svcs. v. M. R.*, 715 A2d 308, 314-315 (N.J. Super. Ct. App. Div. 1998) (theoretical impact on ability to be a childcare provider insufficient to satisfy the "plus" element of stigma-plus test).

Our holding is also consistent with those decisions finding that a liberty or property interest *did* exist where the appellants *were already employed* as childcare providers, or had at least made some showing that child care was their chosen occupation. See *Humphries v. County of Los Angeles*, 554 F3d 1170, 1182-1183 (9th Cir. 2009) (registry listing interfered with teacher's future credentialing and enrollment in certain college courses), reversed on other grounds by *Los Angeles County. v. Humphries*, 562 U.S. 29 (131 SCt 447, 178 LE2d 460) (2010); *Dupuy v. Samuels,* 397 F3d 493, 503-504 (7th Cir. 2005) (childcare workers effectively barred from future employment in their chosen field by their listing in the registry); *Valmonte v. Bane*, 18 F3d 992, 1000 (2d Cir. 1994) (appellant had worked as a school paraprofessional and intended to apply for childcare positions); *Jamison v. Mo. Dept. of Social*

*Svcs., Div. of Family Svcs.*, 218 SW3d 399, 402 (Mo. 2007) (nurses who operated or were employed by residential childcare center had implicated liberty interests where mandatory registry screening impacted employment and licensing). With those few courts that have found that potential restriction of future employment prospects alone is sufficient to meet the "plus" element of *Paul*'s "stigma-plus" test, we simply disagree. See *Winston v. State Dept. of Social and Rehab. Svcs.*, 49 P3d 1274, 1284 (Kan. 2002) (finding a protected liberty interest where registry listing prohibits employment, volunteering, or operation of childcare facility); *In the Matter of W.B.M.*, 690 SE2d 41, 49 (N.C. Ct. App. 2010) (impact on employability or fitness to care for or adopt children constitutes deprivation of liberty interests under North Carolina Constitution).

Steiner also argues that his registry listing may be used against him in a future criminal proceeding. This contention is likewise speculative. Steiner concedes that no criminal charges have been brought related to the incident forming the basis for his registry listing. If criminal charges were brought at some future date, Steiner would be entitled to the full range of constitutional and statutory protections applicable to that separate criminal proceeding. Although the Act provides for the use of information in the registry by

prosecutors "in any court proceeding in the course of any criminal prosecution," such use is limited to circumstances in which the information "is otherwise admissible." OCGA § 49-5-186 (b) (1). This provision does not change the operation of the rules of evidence or otherwise "alter or extinguish" any of the constitutional or statutory rights afforded to defendants in criminal proceedings. The unsupported possibility of a future criminal proceeding in which information from Steiner's registry listing is used against him is too remote and speculative to amount to the alteration or extinguishment of a state-given right for purposes of the *Paul* stigma-plus test.

Because Steiner did not allege or show that inclusion in the registry deprives him of any constitutionally protected liberty or property interest, the procedural guarantees of the Fourteenth Amendment are not implicated. Steiner's as-applied challenge to the Act fails.

## III.

Steiner also raised, and the superior court sustained, several facial constitutional challenges to the Act, which we will consider in turn. To begin, because Steiner's as-applied due process challenge to the Act fails, his facial challenge on that same ground cannot succeed.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (107 SCt 2095, 95 LE2d 697) (1987); see *Bello v. State*, 300 Ga. 682, 685-686 (797 SE2d 882) (2017). And as we have explained, except in the context of certain First Amendment challenges, "one whose own conduct may constitutionally be proscribed cannot challenge a law on the ground that it might conceivably be applied unconstitutionally to others." *Hourin v. State*, 301 Ga. 835, 837 (804 SE2d 388) (2017); see *Catoosa County v. R.N. Talley Properties, LLC*, 282 Ga. 373, 375 (651 SE2d 7) (2007). The United States Supreme Court has offered a similar holding in the context of Article III standing:

> [A] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.

*Ulster County Court v. Allen*, 442 U.S. 140, 154-155 (99 SCt 2213, 60 LE2d 777) (1979). In short, because Steiner has not shown that the Act is unconstitutional as applied to him on due process grounds, his facial challenge also fails.[12]

IV.

Steiner next asserted that the Act functions as a criminal rather than a civil statute. The superior court agreed, finding that because the Act is punitive in nature, those included in the registry are "entitled to the full panoply of rights of a criminal defendant" under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, including the Fifth Amendment protection against self-incrimination and the Sixth Amendment rights to counsel and to a "speedy and public trial." U.S. Const. amends. V, VI, XIV; see *United States v. Ward*, 448 U.S. 242, 248 (100 SCt 2636, 65 LE2d 742) (1980) (noting that the protections of the Sixth Amendment and the Self-Incrimination Clause of the Fifth Amendment are expressly limited to criminal cases). That conclusion is incorrect.

---

[12] Because Steiner's facial attack on the Act falls alongside his as-applied challenge, we need not consider here the continued viability of the "large fraction" standard articulated in *Jackson* for assessing facial constitutional challenges. See *Jackson*, 269 Ga. at 311-312. Nor do we have occasion to consider here the broader validity of *Jackson*'s holdings beyond its adoption of the widely-accepted "stigma-plus" test.

In determining that the Act is "quasi-criminal" in nature, the superior court relied in part on our decision in *Jackson*, 269 Ga. at 310. But *Jackson* is a thin reed for that conclusion. In *Jackson* we did *not* hold that the child abuse registry was criminal in nature, or that the full range of rights afforded to criminal defendants must be granted to those contesting inclusion in the registry. Rather, we held that because Jackson had met the "stigma-plus" standard, due process required that he be "afforded the same protections *in regard to the rights to compel and confront witnesses* as are afforded to constitutionally protected interests in criminal prosecutions." Id. (emphasis supplied). We concluded on that basis that the prior version of the child abuse registry was unconstitutional because it prohibited an alleged abuser from calling a child victim under the age of 14 as a witness at any hearing provided under the Act. See id. at 311-312. That provision has since been repealed, and there is no similar provision in the current version of the Act. Moreover, that decision was plainly based on this Court's due process analysis, and not a conclusion that the Act is criminal in nature.

Although we did not consider in *Jackson* whether the Act was criminal in nature, we do so now, and readily conclude that it is not. In assessing whether a statutory scheme is criminal or civil, the first step is to "consider

the statute's text and its structure to determine the legislative objective." *Smith v. Doe*, 538 U.S. 84, 92 (123 SCt 1140, 155 LE2d 164) (2003). Where the legislature has exhibited an intention to enact a civil regulatory scheme, we next evaluate "whether the statutory scheme [is] so punitive either in purpose or effect as to negate that intention." *United States v. Ward*, 448 U.S. 242, 248-249 (100 SCt 2636, 65 LE2d 742) (1980); see *Cisco v. State*, 285 Ga. 656, 658-659 (680 SE2d 831) (2009). Only "the clearest proof" of punitive purpose or effect will serve to negate the legislature's evident intention with regard to the nature of the statute. *Kansas v. Hendricks*, 521 U.S. 346, 361 (117 SCt 2072, 138 LE2d 501) (1997) (citation and punctuation omitted).

Here, the General Assembly placed the statutes establishing the child abuse registry in Title 49, Chapter 5 of the Georgia Code, pertaining to "Social Services" and "Programs and Protection for Children and Youth." The registry is to be "operated in such a manner as to enable abuse investigators to: (1) Immediately identify and locate substantiated cases; and (2) Maintain and produce aggregate statistical data of substantiated cases." OCGA § 49-5-181 (b). Both the placement of the Act in the Code and its stated function evidence the statute's civil objectives—to act as a resource for

abuse investigators and childcare agencies, not to punish alleged child abusers. See *Smith*, 538 U.S. at 93-94 ("[W]here a legislative restriction is an incident of the State's power to protect the health and safety of its citizens, it will be considered as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.") (citation and punctuation omitted).

We next examine whether any negative effects of the Act are objectively "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." *Hudson v. United States*, 522 U.S. 93, 104 (118 SCt 488, 139 LE2d 450) (1997) (citation and punctuation omitted); see *Cisco*, 285 Ga. at 658-659. This analysis is guided by consideration of the factors identified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (83 SCt 554, 9 LE2d 644) (1963). See *Hudson*, 522 U.S. at 104; *Cisco*, 285 Ga. at 658-659. The seven *Mendoza-Martinez* factors "are neither exhaustive nor dispositive, but are useful guideposts." *Smith*, 538 U.S. at 97 (citations and punctuation omitted).

In *Smith*, the United States Supreme Court identified five of the seven *Mendoza-Martinez* factors as most relevant to the analysis of whether a statutory scheme establishing a sex offender registry was punitive rather than

civil in application, and we follow that Court's example in focusing our analysis here. Those five factors include whether the Act "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97; see *Mendoza-Martinez*, 372 U.S. at 168-169.[13]

An analysis of these factors leads to the conclusion that the Act is civil, not punitive, in both purpose and effect. *First*, maintaining information about a "substantiated case" of child abuse and permitting limited access to that information for specified reasons does not fit within the historic category of punishment. The Act's limited access and confidentiality provisions strongly support the conclusion that its purpose is to make information available to those who need it for child protective functions, rather than to punish the alleged abusers by "shaming" them; in fact, the list would be quite ineffective as a shaming tool given its firm confidentiality limitations. In *Smith*, by way of comparison, the United States Supreme Court concluded

---

[13] The other two factors are "whether [the sanction] comes into play only on a finding of scienter" and "whether the behavior to which [the sanction] applies is already a crime." *Mendoza-Martinez*, 372 U.S. at 169. Here, as in *Smith*, these factors "are of little weight." *Smith*, 538 U.S. at 105.

that even *publicizing* information about a sex offender's criminal record was not akin to historic "shaming" punishments. *Smith*, 538 U.S. at 98-99.

*Second*, and perhaps most telling here, the Act does not impose any "affirmative disability or restraint" on those included in the child abuse registry. As we have already described, Steiner himself has offered no evidence that his inclusion on the list has impacted his life in any way at all. And again, the registry at issue is more narrow than the sex offender registry—which we have also found to be a civil regulatory scheme that is not punitive in nature, see *Rainer v. State*, 286 Ga. 675, 675-676 (690 SE2d 827) (2010).

The superior court was incorrect when it found that the registry is punitive in effect because it precludes those identified as child abusers from working or becoming licensed in the childcare field. As an initial matter, this is not true according to the terms of the statute; the list is accessible to certain agencies, but the Act does not contain any specific prohibition on hiring or licensure. But even if the Act did explicitly prohibit agencies with access to the registry from hiring or licensing individuals included in the registry as child abusers, the foreclosure of some employment opportunities would not render the Act criminal in nature. See *Hudson*, 522 U.S. at 104 ("While

petitioners have been prohibited from further participating in the banking industry, this is 'certainly nothing approaching the "infamous punishment" of imprisonment.'" (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (80 SCt 1367, 4 LE2d 1435) (1960))).

*Third*, the Act does not "promote the traditional aims of punishment—retribution and deterrence." *Mendoza-Martinez*, 372 U.S. at 168. The superior court found that a listing in the registry serves as a deterrent, because an individual included in the registry is "deterred" from working with children. Well, yes. But working with children is not the sort of illegal conduct that the word "deterrence" typically references in this context. And to the extent that an impediment to working in the childcare field may also prevent future acts of child abuse, this indirect deterrent effect does not render the Act punitive. See, e.g., *Smith*, 538 U. S. at 102 ("Any number of governmental programs might deter crime without imposing punishment."). In any event, the statutory provisions limiting access to the registry—indeed, unauthorized access is itself a crime, see OCGA § 49-5-186 (c) and (d)—demonstrate that the list cannot be fairly characterized as a warning to others to avoid acts of abuse. As for the other traditional aim of punishment,

retribution, the superior court did not identify anything retributive in the Act. Nor do we.

*Fourth*, the Act has a legitimate nonpunitive function—to protect children by providing information about reports of child abuse to childcare-related government agencies and licensed childcare providers.

*Fifth*, and finally, including an alleged abuser in a limited-access registry is not excessive in relation to this function. The fact that information about an act of alleged abuse remains in the registry unless removed through the administrative and judicial review provisions of the Act does not render the Act's provisions excessive in relation to its purpose of notifying childcare providers and agencies of incidents of abuse; presumably some would argue that keeping cases on the list is *necessary* to that purpose. In sum, the superior court's conclusion that the Act is criminal cannot be supported.

## V.

The superior court also summarily found that the Act violates the separation of powers doctrine because "at the agency level, executive branch officials have been vested with the right to perform a judicial function." This appears to refer to Steiner's argument that a child abuse investigator is performing a judicial function when he or she determines that a report of

child abuse is a "substantiated case"—that is, that the report "has been confirmed based upon a preponderance of the evidence."  OCGA § 49-5-180 (10).  The abuse investigator is required to notify DFCS of any substantiated case of abuse, and DFCS is then required to include information about the report and the alleged abuser in the registry.  But the fact that the statute uses a legal term of art to define "substantiated case" does not convert the role of an investigator from an administrative one to a judicial one.

The Georgia Constitution provides specific roles for the three branches of state government.  See generally Ga. Const. of 1983, Art. III, Art. V, Art. VI.  "The legislative branch enacts the law, the judiciary interprets those laws and the executive branch enforces those laws until they are amended or held to be unconstitutional."  *Harbuck v. State*, 280 Ga. 775, 778 (631 SE2d 351) (2006) (citation omitted).  The Georgia Constitution is also clear that one branch cannot subsume another's territory:  "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."  Ga. Const. of 1983, Art. I, Sec. II, Par.  III.  Put plainly, one person cannot perform both executive and

judicial functions. See *Brown v. Scott*, 266 Ga. 44, 46 (464 SE2d 607) (1995).

Still, as noted in the only case Steiner cited to support his argument, the separation of powers mandated by our Constitution "is not and from the nature of things can not be total." *Purdue v. Baker*, 277 Ga. 1, 13 (586 SE2d 606) (2003) (citation and punctuation omitted). "The separation of powers principle is sufficiently flexible to permit practical arrangements in a complex government." Id. (citation and punctuation omitted). This Court has recognized that administrative agencies may make quasi-judicial decisions in the course of implementing statutory law. See *Dept. of Transp. v. Del-Cook Timber Co., Inc.*, 248 Ga. 734, 739 (285 SE2d 913) (1982) ("[F]requently, within the exercise of their power, [agencies] are called upon to make factual determinations and thus adjudicate, and it is in that sense that they are also recurrently considered to be acting in a quasi-judicial capacity.") (citations omitted); see also *State of Ga. v. Intl. Keystone Knights of the Ku Klux Klan, Inc.*, 299 Ga. 392, 401-402 (788 SE2d 455) (2016). We have also recognized that "'[t]his dual role which administrative agencies play has long been accepted in this State as being constitutionally permissible. [Cits.] However, this authority is not the same and, therefore, is

distinguishable from the exercising of the "judicial powers" of this State.'" *Bentley v. Chastain*, 242 Ga. 348, 350 (249 SE2d 38) (1978) (quoting *Dept. of Natural Resources v. Linchester Sand & Gravel Corp.*, 334 A2d 514, 522 (Md. 1975)).

With this background, we consider Steiner's claim that the Act violates the separation of powers. DFCS is an arm of the executive branch whose primary purpose is "to protect children." OCGA § 49-3-6; see OCGA § 49-5-8. Among other tasks, DFCS is charged with receiving and investigating reports of child abuse. See OCGA §§ 19-7-5; 49-5-8 (a) (2) (B). The judicial branch, on the other hand, must "'adjudicate any and all justiciable questions presented to it in litigation.'" *Wolcott v. State*, 278 Ga. 664, 666 (604 SE2d 478) (2004) (citation omitted). With respect to the child abuse registry, the abuse investigator's role is limited to investigating reports of child abuse and notifying DFCS if the investigator finds sufficient evidence to conclude that the abuse more likely than not occurred. See OCGA § 49-5-182. This is well within the scope of duties of an executive branch employee. See, e.g., *Harbuck*, 280 Ga. at 778 (police officer making probable cause determination is not performing legislative function); *Mann v. State*, 278 Ga. 442, 444 (603 SE2d 283) (2004) (probation officers'

authority to arrest probationers for suspected violations of the sex offender residency statute does not grant judicial authority to probation officers). The administrative action of the investigation does not approach the boundary line separating executive action from judicial.

Steiner's argument focuses on the investigator's role in determining whether an alleged abuser's name is added to the child abuse registry. But the fact that the Act mandates that all substantiated cases of abuse be included on a list of substantiated cases does not transform the investigator's quintessentially executive function of investigating allegations of abuse into a judicial one—surely DFCS investigators are permitted to reach some kind of conclusion about whether abuse has occurred in a particular situation.

The investigator is not charged with hearing argument and testimony or deciding a dispute between parties; nor is the investigator expected to review his or her own decision regarding whether the evidence substantiates the allegation of abuse. Cf. *Humphries*, 554 F3d at 1197 (child abuse investigator may not both determine whether abuse allegations warrant placement in the child abuse registry and hear appeals from his own decision without violating due process fairness principles). Instead, the alleged abuser has the right to request a hearing before an ALJ, who makes the final agency decision after

hearing evidence and argument from the alleged abuser and from DFCS. OCGA § 49-5-183 (d). The role of the abuse investigator in the determination of whether an incident should be in the child abuse registry does not violate the constitutional principle of separation of powers.

## VI.

The ALJ determined that DFCS had shown by a preponderance of the evidence that Steiner committed an act of child abuse, as defined in OCGA § 19-7-5 (b) (10). Specifically, the ALJ found that Steiner "dry humped" K. S., a 14-year-old child, two times; after the first time, K. S. told Steiner to stop, but he did it again. After the second time, K. S. "got off of" Steiner and walked away from him to make him stop. The ALJ noted that, during her testimony at the administrative hearing, K. S. gave some further description of what Steiner had done when she testified that he "tried to hump her like a dog."

The superior court reversed the ALJ's decision, finding that DFCS had not proved an act of child abuse by a preponderance of the evidence because the child was not asked to define the term "dry humped," and it was not clear to the court whether Steiner's conduct involved any physical contact with the child. But by questioning the meaning of the child's testimony, the superior

court improperly intruded upon the ALJ's role as the finder of fact and substituted its judgment for that of the ALJ regarding the import of witness testimony and the credibility of a witness. On issues involving findings of fact, "the ALJ's decision must be affirmed where there is 'any evidence' to support it." *Hughey v. Gwinnett County*, 278 Ga. 740, 742 (609 SE2d 324) (2004) (citation omitted); see *Ga. Real Estate Comm. v. Burnette*, 243 Ga. 516, 516 (255 SE2d 38) (1979) (superior court "erred in substituting its judgment for that of the agency as to the weight of the evidence").

The term "hump like a dog" is within common understanding, and it is reasonable to conclude that the ALJ understood this descriptive phrase to mean that Steiner performed "an act of apparent sexual stimulation." OCGA § 19-7-5 (b) (10) (G). Further, the evidence that the child was "lean[ing] against [Steiner] on his stomach" and Steiner "wrapped his arms around" her before "hump[ing]" her the "way a dog would" supported the ALJ's implicit finding that the act involved physical contact, as did K. S.'s statement that she had to "g[e]t off of" Steiner and walk away from him to make him stop. Accordingly, at least some evidence exists to support the ALJ's finding that there was "[p]hysical contact in an act of apparent sexual stimulation or

gratification with [Steiner's] clothed or unclothed genitals." OCGA § 19-7-5 (b) (10) (G).

The superior court also noted its concern with the statement in the ALJ's order that there was no evidence that the act was consensual, which indicated to the court that the ALJ may have shifted to Steiner the burden of proving that K. S. consented to the act. This concern was misplaced. The ALJ specifically addressed the burden of proof at the hearing, where the ALJ stated (and DFCS acknowledged) that DFCS had the burden of proving by a preponderance of the evidence that an act of child abuse as defined in the Act had occurred. The ALJ also specifically noted in its order that the law places the burden of proof with DFCS.

Furthermore, the ALJ's statement that there was no evidence of consent immediately follows its finding that K. S. told Steiner to stop after the first time he "dry humped" her, and after Steiner did it again, K. S. got off of him and walked away from him to make him stop. Thus, the statement that there was no evidence of consent is best understood in context with the preceding statements as a finding that the only evidence presented on the issue showed a lack of consent.[14] Because there was some evidence to support the ALJ's

---

[14] We note that lack of consent of the minor victim is not an element of child sexual

finding that DFCS proved an act of child abuse as defined in the Act, the superior court erred in reversing the ALJ's finding on this issue.

Judgment reversed. All the Justices concur.

---

abuse as it is defined in the Act, except in certain circumstances not present here. See OCGA §§ 49-5-180 (8); 19-7-5 (b) (10).

PETERSON, Justice, concurring.

When DFCS determined that Christopher Steiner was to be designated as a "substantiated" child abuser for the rest of his life, it gave him notice of this decision in language so incomprehensible that a third-rate email scammer would be embarrassed to have written it. But Steiner hasn't proved that his designation deprived him of any liberty that the decisions of the United States Supreme Court allow us to recognize under the Due Process Clause of the United States Constitution, and so the failure to give him any meaningful process in connection with his designation does not entitle him to relief. For that reason, I concur in the decision denying Steiner relief. But DFCS **did** fail to provide any meaningful process, and that failure should not go without comment.

Notice and an opportunity to be heard is the sine qua non of due process. The notice that DFCS gave Steiner was utter gibberish: "You were substantiated on as a result of K. S. maltreator exposed the child to inappropriate sexual contact which resulted in the maltreator inappropriately touched and dry humped her in the residence of the legal guardian." This

mash-up of undefined initials, legal-sounding jargon, and made-up words makes ordinary bureaucratese seem Shakespearean by comparison. What does it mean to be "substantiated on"? What is a "maltreator"? Who is K. S.? How does "inappropriate sexual contact" "result" in a "maltreator" "touch[ing] and dry hump[ing]" this unknown person? Those are questions I can answer only with the benefit of the whole record, a benefit Steiner did not enjoy. And after receiving this incomprehensible notice, Steiner had only ten days to decide whether to challenge his designation.

The child abuse registry statute gives DFCS unusually broad power to declare someone to have committed child abuse — one of the most heinous acts possible — before they've had an opportunity to defend themselves. The least we should expect of DFCS is that it will exercise that power seriously and with care to ensure appropriate process. If DFCS believes the notice issued in this case was sufficient, I cannot help but doubt DFCS's commitment to meeting even that minimal expectation. I sincerely hope to be proved wrong.

I am authorized to state that Chief Justice Hines, Justice Blackwell, and Justice Boggs join in this concurrence.

Decided June 18, 2018.

Child Protective Services Information System. Lamar Superior Court. Before Judge Fears.

Turner & Lawrence, Kenneth G. Lawrence; Christopher M. Carr, Attorney General, Annette M. Cowart, Penny L. Hannah, Shalen S. Nelson, Senior Assistant Attorneys General, Andrew A. Pinson, Assistant Attorney General, Sarah Hawkins Warren, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General, Victoria C. Powell, Assistant Solicitor-General, for appellant.

Miller & Key, J. Scott Key, Kayci N. Dennis, for appellee.

Andrew S. Fleischman, Laura D. Hogue; Charles R. Bliss, Mara L. Block, Lisa J. Krisher, Michael J. Tafelski, Jamie B. J. Rush, David A. Webster, amici curiae.